UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

AMERICAN SAFETY INDEMNITY COMPANY,

    Plaintiff,

v.                                    CIVIL ACTION NO. 2:04-0752

STOLLINGS TRUCKING COMPANY, INC.,

    Defendant/Counterclaimant.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending are (1) Stollings' motion for partial summary judgment on the "general business practice" portion of Count IV of its counterclaim, (2) American Safety's motion for partial summary judgment as to Count IV of the counterclaim of Stollings, and (3) American Safety's motion for partial summary judgment on the alleged lost business opportunities of Stollings, all filed on April 24, 2007.[1]

_____

      [1] Stollings' motions to exceed the page limitation filed April 24, 2007, and May 24, 2007, are hereby ORDERED granted.

I.


American Safety issued two policies of insurance to Stollings, effective June 9, 2001 through June 9, 2002.  The general aggregate limit for the commercial general liability policy ("CGL") during the relevant period was $2,000,000, and the limit per occurrence was $1,000,000.  The general aggregate limit and the per occurrence limit of the excess liability policy was $4,000,000.

On July 22, 2004, American Safety sued Stollings seeking a declaratory judgment that the CGL and excess insurance policies Stollings purchased from American Safety did not require it to defend or indemnify Stollings in Mannie Ray Nelson's claim against Stollings ("Nelson claim").  On August 9, 2004, Stollings answered and counterclaimed seeking a declaratory judgment that American Safety had a duty to defend or indemnify Stollings on the Nelson claim as well as on Wyson Bartley's claim against Stollings ("Bartley claim") and Georgia Murphy's claim against Stollings ("Murphy claim").  These three (collectively "the underlying claims") constitute Counts I, II and III, respectively, of the counterclaim.  Count IV, the only other claim, consists of extra-contractual remedies and is entitled

"Violations of West Virginia Insurance Regulations, West Virginia Unfair Trade Practices Act/Bad Faith."

On August 16, 2005, the coverage issues under Counts I, II and III were bifurcated from Count IV of Stollings' counterclaim by court order.  On August 28, 2006, the court entered an order finding coverage existed under Stollings' policy with American Safety on all three of the underlying claims, except as to medical payment coverage for all three.  The issues remaining are damages from the declaratory phase and resolution of Count IV of the counterclaim.

On November 1, 2004, the court permitted the parent of Stollings' automobile liability insurance carrier, Clarendon National Insurance Company ("Clarendon"), to intervene.  On January 30, 2007, Clarendon was terminated from the lawsuit by the court's approval of an agreed upon order.  Under a reservation of rights, Clarendon defended Stollings on the Bartley and Murphy claims which have both settled, and American Safety is currently defending Stollings on the Nelson claim which has not yet been resolved.

II.


A.        Bartley Claim


          On or about August 8, 2001, Bartley suffered a

"crushing" injury when he attempted to unload timbers for his

employer, A and M Surveying, Inc. (Bartley Compl., attached as

Ex. B to Counterclaim).  The complaint alleges that Stollings,

along with Ricky Ball, an individual defendant, negligently

loaded timbers onto a truck owned and driven by Ball.  (Id.).

Stollings first learned of the potential claim of Mr. Bartley on

December 10, 2002, when it received a letter from his counsel.

(12-10-02 letter, attached as Ex. 1 to Stoll. M.S.J.).  By

January 2003, Stollings submitted the Bartley claim to City

Insurance Professionals, the agency which sold Stollings the

American Safety commercial general liability ("CGL") and excess

policies.  (01-08-03 Letter, attached as Ex. 2 to Stoll. M.S.J.).

It is unclear why American Safety did not immediately receive the

claim, but it is undisputed that American Safety was aware of the

claim by May 7, 2003.  (08-05-03 Denial of Coverage Letter,

attached as Ex. 3 to Stoll. M.S.J.).  Bartley filed his complaint

in the Circuit Court of Boone County, West Virginia, on or about

June 24, 2003, alleging that Stollings, along with an individual

4

defendant, Ricky Ball, negligently loaded timber in a truck owned and driven by Ball. (Bartley Compl., attached as Ex. B to Counterclaim). On August 5, 2003, American Safety denied coverage in a letter to Stollings. (08-05-03 Denial of Coverage Letter, attached as Ex. 3 to Stoll. M.S.J.).

American Safety failed to mention the products completed operations hazard provision in its letter denying coverage on August 5, 2003. (08-05-03 Bartley coverage denial ltr, attached as Ex. 3 to Stoll. M.S.J.; Curry Depo. at 103, attached as Ex. 4 to Stoll. M.S.J.). Following this omission from American Safety's correspondence, American Safety then formally disputed the applicability of the products completed operations hazard provision in its denial of a request for admission on January 28, 2005. (Paragraph 9 of RFA, attached as Ex. 5 to Stoll. of M.S.J.).

Although the claims handler for American Safety, Shawn Stinson, could point to no new information that came to light after the initial denial of coverage in 2003, sometime in the spring of 2005, American Safety realized the products completed operations provision did cover the Bartley claim and changed its position, concluding that coverage existed. (Stinson Depo. at 56, 65-66, attached as Ex. 6 to Stoll. M.S.J.). Yet, it did not

5

so notify Stollings and continued to dispute applicability of this provision of the policy to the Bartley claim until the court entered its order, on August 28, 2006, concluding that the Bartley claim was covered by that provision.  (Id. at 52-53, 56, 61, attached as Ex. 6 to Stoll. M.S.J.).  Of course, the failure to notify Stollings of the change compelled Stollings to continue to litigate the declaratory judgment portion of this case as to this underlying claim.  American Safety also never recorded its decision in the claim file.  (Stinson Depo. at 57-58, attached as Ex. 6 to Stoll. M.S.J.).

        In a brief, filed December 23, 2005, American Safety represented that it never denied coverage for the Bartley claim, but American Safety has since acknowledged its mistake and asserts that it did not mean to mislead.  (12-23-05 Am. S. Brief at 3, 14, attached as Ex. 7 to Stoll. M.S.J.).

B.        Murphy Claim

        On July 24, 2002, American Safety received notice of the Murphy complaint filed against Stollings in the Circuit Court of Mingo County, West Virginia.  (Murphy Compl., attached as Ex. C to Counterclaim; Internal Suit Log, attached as Ex. 8 to Stoll.

6

M.S.J.).  On September 3, 2002, American Safety sent Stollings two reservation of rights letters, one for the CGL and one for the excess policy.  (09-03-02 Res. of Rts. Ltr. for CGL, attached as Ex. 9 to Stoll. M.S.J.; 09-03-02 Res. of Rts. Ltr. for Excess, attached as Ex. 10 to Stoll. M.S.J.).  The letters indicated it needed to conduct an investigation into the matter.  (Id.).  In early 2003, American Safety concluded informally and internally that coverage did not exist for the Murphy claim.  (Stinson Depo. at 73-75, attached as Ex. 6 to Stoll. M.S.J.).  However, this position was not communicated to Stollings prior to the deposition of Shawn Stinson on March 27, 2007, long after the counterclaim had been filed on August 9, 2004, and the Murphy case settled in October 2005.  (Id.; Stoll. Memo. in Supp. of M.S.J. at 18).

        Like the Bartley claim, American Safety in its opening letter failed to mention the products completed operations hazard provision, and then later affirmatively denied the applicability of the provision in a formal response.  (09-03-02 Res. of Rts. Ltr. for CGL, attached as Ex. 9 to Stoll. M.S.J.; 09-03-02 Res. of Rts. Ltr. for Excess, attached as Ex. 10 to Stoll. M.S.J.; Stinson Depo. at 73-76, attached as Ex. 6 to Stoll. M.S.J.; Am. S. Answer to paragraph 44 of Counterclaim).  However, in the

7

Murphy action, the letter was a reservation of rights letter, rather than a denial of coverage letter as in the Bartley claim, and this time the formal response of denial was in the answer to Stollings' counterclaim rather than a request for admission as in the Bartley claim.  (Id.).

On a separate point, Stollings was the sublessee in a sublease with Ark Land Co. ("Ark Land") executed on June 22, 1995, upon which Stollings was to mine coal in Logan County. (06-14-04 Mabry & McClelland Ltr. at 2, attached as Ex. 17 to Stoll. M.S.J.).  The sublease contained two provisions relevant here. The first required Stollings to carry and keep in full force insurance policies relating to employers' liability, general liability, and automobile liability.  (Sublease § 12.01(a), attached as Ex. 15 to Stoll. M.S.J.).  The same provision required Stollings to name Ark Land as an additional insured on the policies.  (Id.).  The second noteworthy provision stated that Stollings agreed to "indemnify and hold harmless Sublessor from any and all claims . . . that may result from" the sublease. (Id. at § 12.02).

In June 2000, Stollings asked American Safety that Ark Land be made an additional insured under its policy.  (State Court Murphy Memo. at 2, attached as Ex. 13 to Stoll. M.S.J.;

8

Application, attached as Ex. 14 to Stoll. M.S.J.).  Stollings received a certificate of insurance from American Safety designating Ark Land as an additional insured under the policy relevant to this case.  (06-13-00 Ltr, attached as Ex. 15 to Stoll. M.S.J.; Certificate, attached as Ex. 13 to Stoll. M.S.J.).

Stollings hired Maxx Contractors Inc. to transport the coal, and the vehicle of one of its drivers struck Ms. Murphy's vehicle in 2001, killing her.  (Id.).  The administratrix of the Murphy estate sued Stollings, among others, and later in an amended complaint, Ark Land.  (Murphy Compl., attached as Ex. C to Counterclaim; Stoll. Memo. in Supp. of M.S.J. at 10).  Ark Land then filed a cross-claim against Stollings.  (Am. S. Resp. to Stoll. M.S.J. at 11).

Because the amended complaint alleged Ark Land's direct liability for involvement in a conspiracy to overload coal trucks to increase profits, American Safety took the position that "it could not cover Ark Land's cross-claim because the complaint did not allege Ark Land's vicarious liability for Stollings' acts." (Am. S. Resp. to Stoll. M.S.J. at 11).  Based on its understanding that the policy only covered Ark Land when it was vicariously liable for the conduct of Stollings and not when it

9

was directly liable for overloading coal trucks, as alleged in the Murphy complaint, American Safety denied coverage for Ark Land on June 14, 2004.  (Resp. to Stoll. M.S.J. at 10-11; 06-14-04 Mabry & McClelland Ltr., attached as Ex. 17 to Stoll. Memo. in Supp. of M.S.J.).  By refusing coverage for Ark Land, American Safety effectively denied coverage to Stollings in its defense of Ark Land's cross claim.

Stollings provides the following list of cases in which American Safety lost to an insured on this same argument: Spurlock v. Titan Mining, Inc., Civil Action No.: 04-C-93, Circuit Court of Logan County; Moore v. Arch Coal, Civil Action No.: 03-C-1165, Circuit Court of Kanawha County; Johnson v. Elk Run, Civil Action No.: 03-C-52, Circuit Court of Boone County; Williams v. Alex Energy, Civil Action No.: 02-C-183, Circuit Court of Nicholas County; Lackey v. Bandmill, Civil Action No.: 04-C-69, Circuit Court of Mingo County; and Smoot v. Bandmill, Civil Action No.: 04-C-278, Circuit Court of Logan County. (Resp. to Am. S. Mot. in Lim. for Puni. Dam. at 13-14). American Safety acknowledges that its coverage position was rejected by six state courts, but it argues those decisions occurred after the settlement in the Murphy matter in October 2005.  (Am. S. Resp. to Stoll. M.S.J. at 11).

C.        Nelson Claim

          Mannie Ray Nelson filed an amended complaint in the
Circuit Court of Logan County, West Virginia on May 26, 2004.
(08-28-06 Order).  The amended complaint alleges that he was
injured on or about April 30, 2002, while driving a water truck
with faulty brakes owned by Stollings at a time, when he, as an
employee of Personnel Management, was performing contract labor
for Stollings.  (Id.).  As such he was a leased worker within the
definition of "employee" under Stollings policy with American
Safety.  (Id.).  In his complaint, Nelson stated causes of action
for "negligent work environment" and "intentional exposure to
injury."  (Id.).  The accident occurred on property belonging to
Stollings.  (Id.).  By letter, dated June 30, 2004, American
Safety agreed to defend Stollings in Nelson's state court action
under a reservation of rights.  (Id.).  In the letter American
Safety asserts that it had no duty to Stollings because the
policy excludes coverage for an employee's bodily injury "arising
from and in the course of . . . [e]mployment.'"  (Id.).  In
contrast, the counterclaim by Stollings sought a continuing
defense without reservation.  (Id.).  In its order on August 28,
2006, the court determined that the stop-gap endorsement

11

provision of the policy covers Nelson's tort claims, whether for negligence or deliberate intent, under the logic of <u>Erie Insurance Prop. and Cas. Co. v. Stage Show Pizza, JTS, Inc.</u>, 553 S.E.2d 257, 262-266 (W.Va. 2001).  (<u>Id.</u>).

III.

**A.   The Summary Judgment Standard**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  <u>Id.</u>  The moving party has the burden of showing -- "that is, pointing out

12

to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the

facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B.      Cross-Motions for Partial Summary Judgment on "General Business Practice" Portion of Count IV of Counterclaim[2]

W. Va. Code § 33-11-4(9) provides as follows:

Unfair claim settlement practices. - No person shall commit or perform with such frequency as to indicate a <u>general business practice</u> any of the following:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (b) Failing to acknowledge and act <u>reasonably</u> promptly upon communications with respect to claims arising under insurance policies; . . . (d) Refusing to pay claims without conducting a <u>reasonable</u> investigation based upon all available

---

[2]  American Safety's motion seeks even broader relief than dismissing the "general business practice" portion of Count IV. It attempts to dismiss Count IV altogether.  Count IV could be construed to include a common law bad faith claim in addition to the statutory "general business practice" violation alleged pursuant to W. Va. Code § 33-11-4(9).  Because the court ultimately concludes American Safety's motion for partial summary judgment of Count IV should be denied on the narrow basis that a general business practice may exist, the court need not at this point further analyze any other potential aspects of Count IV, including, for example, a potential common law claim under <u>Hayseeds, Inc. v. State Farm Fire & Cas.</u>, 177 W.Va. 323, 352 S.E.2d 73 (W. Va. 1986).

> information; . . .
> (k) Making known to insureds or claimants a policy
> of appealing from <u>arbitration</u> awards in favor of
> insureds or claimants for the purpose of compelling
> them to accept settlements or compromises less than
> the amount awarded in <u>arbitration</u>; . . .
> (n) Failing to promptly provide a <u>reasonable</u>
> explanation of the basis in the insurance policy in
> relation to the facts or applicable law for denial
> of a claim or for the offer of a compromise
> settlement; . . . .

W.Va. Code § 33-11-4(9) (emphasis added).

       An insured may recover for an insurer's proven
violation of the Unfair Trade Practices Act, W. Va. Code § 33-11-
1, <u>et</u> <u>seq.</u>, ("UTPA") in handling the insured's claim, but only
"if it can be shown that there was more than a single isolated
violation of W. Va. Code § 33-11-4(9) and that the violations
indicate a 'general business practice' on the part of the
insurer." <u>McCormick v. Allstate Ins. Co.</u>, 475 S.E.2d 507, 519
(W. Va. 1996) (citing <u>Jenkins v. J.C. Penney Cas. Ins. Co.</u>, 280
S.E.2d 252 (W. Va. 1981)).  Although there are three underlying
claims at issue here, a general business practice under the UTPA
may be established by either showing multiple separate and
discrete violations relating to just one claim or by establishing
forbidden practices across several claims.  <u>Maher v. Continental</u>
<u>Cas. Co.</u>, 76 F.3d 535, 543, n. 10 (4th Cir. 1996); <u>Elmore v.</u>
<u>State Farm Mut. Auto. Ins. Co.</u>, 202 W.Va. 430, 439, 504 S.E.2d
893, 902 (W. Va. 1998); <u>Dodrill v. Nationwide Mutual Ins. Co.</u>,
201 W.Va. 1, 13, 491 S.E.2d 1, 13, (W. Va. 1997); <u>Jenkins</u>, 167

15

W.Va. at 610, 280 S.E.2d at 260 (W. Va. 1981), <u>overruled on other grounds by</u> syl. pt. 3, <u>State ex rel. State Farm Fire & Cas. Co. v. Madden</u>, 192 W.Va. 155, 451 S.E.2d 721, (W.Va. 1994).[3]  The parties' cross-motions for partial summary judgment dispute whether American Safety's conduct constitutes a general business practice of engaging in unfair claim settlement practices in violation of W. Va. Code § 33-11-4(9).

Stollings alleges a total of fifteen individual violations of the statutory provisions in W. Va. Code § 33-11-4(9) across all three of the Bartley, Murphy, and Nelson underlying claims.[4]  Although American Safety's argument that (k) is inapplicable is persuasive, it is apparent that questions remain with regard to, at least, provisions (a), (b), (d), and (n) that are appropriate for jury determination.

---

[3]  In 1981, the West Virginia Supreme Court established that W. Va. Code § 33-11-4(9) contained an implicit private cause of action.  Syl. pt. 2, in part, <u>Jenkins v. J.C. Penney Cas. Ins. Co.</u>, 167 W.Va. 597, 280 S.E.2d 252 (1981), <u>overruled on other grounds by</u> syl. pt. 3, <u>State ex rel. State Farm Fire & Cas. Co. v. Madden</u>, 192 W.Va. 155, 451 S.E.2d 721, (W.Va. 1994).  This principle of recognizing an implicit cause of action in the statute was recently upheld.  Syl. pt. 4, <u>Taylor v. Nationwide Mut. Ins. Co.</u>, 214 W.Va. 324, 589 S.E.2d 55 (W.Va. 2003).

[4]  Thirteen of the fifteen allegations allege violations of 114 C.S.R. § 14 in addition to the statutory provisions in W. Va. Code § 33-11-4(9).  A sixteenth allegation cites no violation of a statutory provision, but instead, relies solely on breach of the rule, 114 C.S.R. § 14.3.

1.  Alleged Violations of W. Va. Code §§ 33-11-4(9)(b), (d), (n)


        Subsections (b), (d), and (n) are essentially
reasonableness determinations.  See id.  The West Virginia
Supreme Court has previously explained that subsections of the
UTPA that involve reasonableness determinations are "ordinarily
questions of fact for the jury."  Syl. pt. 5, Hicks ex rel. Saus
v. Jones, 217 W.Va. 107, 109, 617 S.E.2d 457, 459 (W.Va. 2005);
syl. pt. 3, Jackson v. State Farm Mut. Auto. Ins. Co., 215 W.Va.
634, 637, 600 S.E.2d 346, 349 (W.Va. 2004).  In both Jones and
Jackson, the West Virginia Supreme Court reversed the circuit
court's ruling as a matter of law that the insurer violated the
UTPA and remanded.  Jackson, 215 W.Va. at 643, 600 S.E.2d at 355;
Jones, 217 W.Va. at 110, 617 S.E.2d at 460.  It explained, "[w]e
went on in Syllabus Point 3 of Jackson to conclude that the
reasonableness of an insurance company's conduct 'ordinarily [is
a] question [] of fact for the jury' that should not be
determined as a matter of law by a trial court."  Jones, 217
W.Va. at 115, 617 S.E.2d at 465 (citing syl. pt. 3, Jackson, 215
W.Va. at 637, 600 S.E.2d at 349)).

        Just as in Jones and Jackson, the allegations are that
American Safety acted unreasonably either in the time it took to
respond to Stollings in the Murphy action, in the breadth of its
investigation into the validity of Stollings' request for a

17

defense in the Bartley and Murphy actions, or in its explanation
for denial of the claims in the Bartley and Murphy claims.  With
respect to the reasonableness determinations in (b), (d), and (n)
here, the court sees no reason to depart from the general rule
set forth in <u>Jones</u> and <u>Jackson</u>.  Resolution of these allegations
are best left for the jury.[5]

   2.  Alleged Violations of W.Va. Code § 33-11-4(9)(a)

        American Safety's arguments in response to allegations
it violated (a), which prohibits misrepresentation of facts or
policy coverage provisions, are largely that its coverage
decisions and positions on all three of the underlying claims may
not have been in accord with the facts and the terms of the
policies but were nonetheless held in good faith.

        For example, in defending its initial denial of
coverage in the Bartley claim, American Safety puts forth the
testimony of its claims handler, Shawn Stinson, that he
originally thought coverage was for mining accidents exclusively
and did not extend to sawmill accidents.  (Stinson Depo. at 56,
66, attached as Ex. 6 to Stoll's M.S.J.).  According to American

---

[5]  Barring a determination that the statute of limitations
has expired, this finding precludes American Safety from
prevailing on its summary judgment motion.

18

Safety, Stinson's misunderstanding caused it to assert the
"covered operations endorsement" in the policies as a basis for
exclusion and to omit reference to the "products completed
operations hazard" provision, which provided coverage.  (Id.).
Similarly, with respect to the Murphy claim, American Safety
contends that the initial reservation of rights letter was
written with the good faith belief that Clarendon's coverage as
well as some other terms of the policy might bar coverage.  In
refusing to provide coverage to Stollings for the cross-claim of
Ark Land when all six of the West Virginia state circuit courts
to consider the issue have rejected the argument advanced by
American Safety and have reached the opposite conclusion,
American Safety responds that its position was still held in good
faith because the previous contrary rulings occurred after the
Murphy settlement, and moreover all six were by state circuit
courts that were not binding on the state circuit court in
Murphy.  (Resp. to Stoll. Memo. in Supp. of M.S.J. at 11).
Likewise, in the Nelson claim, American Safety's asserted
position of applicability of exclusion 3 within the stop gap
endorsement was found in the court's order of August 28, 2006, to
be contrary to the holding in Stage Show Pizza.  As the party
that instituted this action for the purpose of securing a
declaratory judgment, American Safety argues this position was
clearly held in good faith.

        The questions raised are more appropriate for a jury

than the court.  As American Safety's expert, John Curry,
explained, reasonable minds could differ on whether American
Safety misrepresented its policies or made good faith mistakes
insufficient to constitute a general business practice failure.
(Curry Depo. at 104-105, attached as Ex. 4 to Stoll. M.S.J.).

    3.   Alleged Violations of W. Va. Code § 33-11-4(9)(k)

        American Safety points out that (k) refers only to
arbitration awards, not settlement discussions in mediation.
W.Va. Code § 33-11-4(9)(k).  To reiterate, the provision bars the
insurer from "[m]aking known to insureds or claimants a policy of
appealing from <u>arbitration</u> awards in favor of insureds or
claimants for the purpose of compelling them to accept
settlements or compromises less than the amount awarded in
<u>arbitration</u>."  <u>Id.</u>  Stollings alleges that American Safety told
it in a mediation that they might exercise their right to appeal
the court's previous order regarding the application of coverage.
First, this isolated conduct does not constitute a "policy of
appealing awards."  Second, Stollings' attempt to analogize
American Safety's conduct at mediation to the arbitration context
described in (k) is likewise unavailing.  Stollings cites no case
law in support of this argument.  The court agrees with American
Safety and finds that (k) would not encompass American Safety's
conduct in a mediation.  Consequently, Stollings' argument that

20

American Safety violated (k) by threatening to appeal is
misplaced and may not serve as a basis for finding that American
Safety engaged in a general business practice of violating the
act.

### 4.   Alleged Violations of 114 C.S.R. § 14

Stollings alleges a litany of violations of the Code of
State Rules, including 114 C.S.R. §§ 14-4.1, 14-4.2, 14-4.3, 14-
5.1, 14-5.3, 14-6.2a, 14-6.2b, 14-6.3, 14-6.5, 14-6.6, 14-6.7,
14-6.8.  The rules are cumulative of the robust list of section
33-11-4(9) statutory practices that are alleged to permeate all
three of the underlying claims and which may together constitute
a general business practice.  Consequently, the alleged rules
violations need not be considered except insofar as they may
inform the scope and purpose of the statutory practice at issue.

### 5.   Statute of Limitations

Throughout their briefs, American Safety raises a
statute of limitations defense to a portion of the allegations
implicating the Bartley and Murphy claims.  The West Virginia
Supreme Court has determined that "[c]laims involving unfair
settlement practices that arise under the Unfair Trade Practices
Act, West Virginia Code § 33-11-1 to -10 [] are governed by the

21

one-year statute of limitations set forth in West Virginia Code §
55-2-12(c) [].”  Syl. pt. 1, <u>Wilt v. State Automobile Mutual Ins.
Co.</u>, 203 W.Va. 165, 506 S.E.2d 608 (W.Va. 1998).  However, “[t]he
one-year statute of limitations which applies to claims of unfair
settlement practices brought pursuant to West Virginia Code §
33-11-4(9) [] does not begin to run until the appeal period has
expired on the underlying cause of action upon which the
statutory claim is predicated.”  Syl. pt. 7, <u>Klettner v. State
Farm Mut. Auto. Ins. Co.</u>, 205 W.Va. 587, 589, 519 S.E.2d 870, 872
(W.Va. 1999).  The counterclaim at issue was filed on August 9,
2004, before the appeal period on each the Bartley, Murphy and
Nelson claims had begun to run.  The statute of limitations
argument is without merit.

### 6. Punitive Damages

Because the court has stated it is possible that
Stollings could establish at trial that American Safety engaged
in a general business practice in violation of the act, the court
must consider summary judgment on the standard needed for
punitive damages.  American Safety contends Stollings has not set
forth evidence that would entitle it to punitive damages,
whereas Stollings contends the issue should be submitted to a
jury.

Punitive damages are available in this context if a

22

plaintiff shows that his insurer acted with actual malice.  Syl.
pt. 2, McCormick, 505 S.E.2d 454, 202 W.Va. 535.  The West
Virginia Supreme Court has explained that actual malice means
"that the company actually knew that the policyholder's claim was
proper, but willfully, maliciously and intentionally utilized an
unfair business practice in settling, or failing to settle, the
insured's claim."  Id.

        Here, consideration of punitive damages rests with the
jury.  The following examples could lead a reasonable jury to
conclude that American Safety acted willfully, maliciously, and
intentionally and that punitive damages are warranted: American
Safety failed to disclose its determination that coverage did in
fact exist on the Bartley claim after its re-evaluation;
American Safety denied coverage for Ark Land in the Murphy case
based on a position that has since been rejected by multiple
state circuit courts; American Safety failed to communicate its
coverage position on the Murphy claim for a period of years
following the initial reservation of rights letters.

        In summary, neither side is entitled to summary
judgment on the general business practice claim.  Stollings may
assert violations with respect to (a), (b), (d), and (n).  The
court concludes there is no reasonable basis upon which a
violation of (k) could be alleged.  The allegations are not
barred by the statute of limitations.  Because Stollings has

23

alleged enough facts that, if proven, could allow a reasonable
factfinder to conclude American Safety acted with "actual
malice," the punitive damages issue will be submitted to the
jury.

C.        Lost Business Opportunities/Lost Profits

        American Safety filed a separate motion for partial
summary judgment to deny Stollings' claim for lost business
opportunities.  While the parties characterize the issue in terms
of "lost business opportunities," the West Virginia Supreme Court
has discussed the issue in terms of "lost profits."  <u>Cell, Inc.</u>
<u>v. Ranson Investors</u>, 189 W.Va. 13, 16, 427 S.E.2d 447, 450 (W.Va.
1992).

        Because of its understanding that American Safety was
not going to provide coverage for the potential liability in the
underlying suits, Stollings claims it refrained in 2004 to 2006
from conducting its planned coal mining operations to open up the
first of two mines for which it received a permit in 1999, by
reason of which it suffered substantial monetary loss.  (Resp. to
Lost Bus. Opp. M.S.J. at 2).  Stollings argues its business was
"paralyzed because it was facing a multi-million dollar claim
with only One Million Dollars in coverage instead of the Six
Million it had purchased."  (<u>Id.</u> at 6).  Stollings is referring
to a $15 million demand in the Murphy case by counsel for Murphy

24

in the face of the available Clarendon coverage of $1 million, with American Safety having informed Stollings that it was proceeding on the basis of a reservation of rights with respect to its $5 million in coverage.  (Id. at 5-6).  The Murphy claim was settled in October 2005.  (08-28-06 Or. at 28).  The Bartley claim was settled, apparently for $75,000, in 2006 and the Nelson claim remains pending with a $1 million demand.  (Resp. to Lost Bus. Opp. M.S.J. at 8, 11).

        Prior to 2004, Stollings operated in the Coalburg seam where, in 2003, a rock fall occurred that brought about the end of its mining in that mine in December, 2003.  (Marcum Depo. at 57, attached as Ex. C to Mot. in Lim. for Untimely Disc. Resp.).  As a consequence, Stollings planned to enter the Coalburg coal seam from the other side of the mountain.  (Id. at 59).  The plan was to mine the coal from this new entry to the Coalburg seam and, at some point, to mine the Winifrede coal seam located 180 feet beneath the Coalburg seam.  (Marcum Depo. at 51, attached as Ex. 1 to Resp. to Lost Bus. Opp.).  According to Willis Marcum, a former owner until 2001 and now consultant of Stollings, it decided to forego, for the time being, the opening of a new mine due to concerns about American Safety's coverage of the three underlying claims.  (Marcum Depo. at 59, attached as Ex. C to Mot. in Lim. for Untimely Disc. Resp.).

        As a result of the delay, which for about 2 ½ years

25

extended from May 2004 to sometime in the latter part of 2006,
Marcum asserted that Stollings lost some $20 to $28 million.
(Id. at 57, 102-104; Marcum Depo. at 209, attached as Ex. A to
Memo. in Supp. of Lost Profits M.S.J.; 03-16-07 Conley Depo. at
39, attached as Ex. D to Mot. in Lim. for Untimely Disc. Resp.;
(Marcum Depo. at 53, attached as Ex. 1 to Resp. to Lost. Bus.
Opp. M.S.J.).  At his deposition, Marcum mentioned spreadsheets
compiled by Harold Davis, an outside CPA, when he asserted that
Stollings had suffered $28 million in lost profits as a
consequence of American Safety's misconduct, but the spreadsheets
are not in the record before the court. (Stoll. Resp. to 2nd
Interr. at 2, attached as Ex. A to Mot. in Lim. to Exclude Davis;
Marcum Depo. at 103, attached as Ex. C to Mot in Lim to Exclude
Untimely Disc. Resp.).  Davis's spreadsheets were compiled based
on information provided by Marcum and Conley.  (Marcum Depo. at
103, attached as Ex. C to Mot in Lim to Exclude Untimely Disc.
Resp.; Reply to Resp. to Lost Bus. Opp. M.S.J. at 4).  American
Safety notes Mr. Davis was never disclosed as an expert and that
neither Marcum or Davis or anyone else is being offered as an
expert witness on lost profits. (Resp. to Lost Bus. Opp. M.S.J.
at 1-2, 4).

      A business may certainly recover damages for lost
profits in a breach of contract action.  Cell, 189 W.Va. at 16,

427 S.E.2d at 450.  However, damages for lost profits are
permissible "only if the plaintiff establishes the lost profits
with reasonable certainty; lost profits may not be granted if
they are too remote or speculative." Id. at syl. pt. 2; syl. pt.
2, Given v. Field, 199 W.Va. 394, 395, 484 S.E.2d 647, 648 (W.Va.
1997).  In other words, "'[l]oss of profits can not be based on
estimates which amount to mere speculation and conjecture . . .
.'" Cell, 189 W.Va. at 16, 427 S.E.2d at 450; Smithson v. U.S.
Fidelity & Guar. Co., 186 W.Va. 195, 207, 411 S.E.2d 850, 862
(W.Va. 1991).

        Here, there is a total lack of evidence presented by
Stollings in support of its position that it has lost $20 to $28
million in profits based on American Safety's conduct.  When
confronted by American Safety's summary judgment motion on the
issue, the only evidence Stollings could muster in response were
excerpts from the depositions of Marcum and of its office
manager, Elizabeth Conley.  (Resp. to Lost Bus. Opp. M.S.J. at 4,
11).  The deposition testimony merely included Marcum's
unsupported assertion that Stollings had lost $28 million in
failing to pursue the new deep mine operations because of
American Safety's alleged misconduct.  (Marcum Depo. at 36-38,
41, 45, 50-56, 66-71, 88-90, attached as Ex. 1 to Resp. to Lost
Bus. Opp. M.S.J.).  Stollings' response did not attach any
reports or an affidavit.  There was not even an attempt to

27

explain how Marcum arrived at the $20 to $28 million figure.[6]

        The paucity of evidence provided by Stollings is even more troubling when viewing the concern in <u>Cell</u> regarding the speculative nature of lost profits sought for speculative endeavors.  "[I]f the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult."  <u>Cell</u>, 189 W.Va. at 15, 427 S.E.2d at 449 (citing <u>Restatement (Second) of Contracts</u> § 352 cmt. b (1981)).  Though Stollings is not a new business, the West Virginia Supreme Court, in a case that preceded <u>Cell</u>, has recognized that beginning new coal mining operations implicates the kind of speculative claim that requires heightened scrutiny.  In <u>State ex rel. Shatzer v. Freeport Coal</u>

_____

        [6] During a teleconference on July 27, 2007, in an effort to aid trial preparation, the court indicated to the parties that it would be granting American Safety's motion for summary judgment on the lost profits issue.  On July 29, 2007, Stollings filed a motion for reconsideration of that decision.  For the first time, Stollings argues in the motion for reconsideration that from 2004 to 2006 "coal sold at a higher rate than the current market and the business cost of mining was lower than current business costs."  (Mot. for Recon. at 2).  This argument was not offered in the Stollings' response to American Safety's motion for summary judgment and remains undeveloped in the evidence presented to the court.  Stollings further contends "[t]he evidence to document Stollings' loss is not speculative."  However, Stollings again fails to state what the evidence is and fails to attach exhibits that might otherwise explain the loss.  Moreover, the exhibits attached to Stollings' response to the motion for summary judgment on the lost profits issue did not contain any evidence in support of this claim.

Company, 144 W.Va. 178, 191, 107 S.E.2d 503, 516 (1959),
overruled on other grounds by Cell, 189 W.Va. at 16, 427 S.E.2d
at 450, the court explained that the profit realized by an
established coal operator in the "Freeport seam of coal does not
prove or tend to prove that he would have made any profit or that
he would not have incurred a loss if he had conducted his
operation in the [untapped] Bakerstown seam of coal . . . ."
The new endeavor here of going around the mountain to reinitiate
mining of the Coalburg seam where a bad rockfall had just
occurred followed by mining of the previously untapped Winifrede
seam coupled with the uncertain nature of coal exploration
generally, means Stollings faces a high bar in proving the
reasonable certainty of its lost profits in postponing mining of
these two deep mine coal seams.  See id.; Cell, 189 W.Va. at 16,
427 S.E.2d at 450.

        Although Cell acknowledged "proof will be more
difficult," to support a lost profits claim for a new or
speculative endeavor, it stated immediately afterward that
"[n]evertheless, damages may be established with reasonable
certainty with the aid of expert testimony, economic and
financial data, market surveys and analyses, business records of
similar enterprises, and the like."  Cell, 189 W.Va. at 15-16,
427 S.E.2d at 449-450 (citing Restatement (Second) of Contracts §
352 cmt. b (1981)); see also Maher v. Continental Cas. Co., 76
F.3d 535, 541 (4th Cir. 1996).  The record before the court is

totally devoid of such evidence.  There are no experts being offered, no market surveys or analyses, no business records of similar enterprises.

        Marcum testified that the $28 million figure was based on extrapolating the statistics in mining the Coalburg seam in 2001 and 2002.  (Marcum Depo. at 115, attached as Ex. C to Am. S. Mot. in Lim. for Untimely Disc. Resp.).  More telling are the income and loss figures for Stollings for the five years of its operations in the Coalburg seam until the rockfall ended its mining there in December 2003.  Stollings' fluctuating income included $291,756 in 1999, $58,000 in 2000, $512,000 in 2001, $28,000 in 2002, and a loss of $219,000 in 2003, before recording a gain of $208,000 in 2004.[7]  (Memo. in Supp. of Lost Bus. Opp. M.S.J. at 6; Conley Depo. at 63, attached as Ex. 2 to Resp. To Lost Bus. Opp. M.S.J.).  The insupportability of the $20 to $28 million extrapolation is clear when juxtaposed with these figures.  Stollings' annual income between 1999 and 2003 averaged $134,151.20.  Their annual income in 2004 of $208,000 actually exceeded the average over the previous five years.  Even using only the 2001 and 2002 figures, the average annual income would

---

        [7]  Though the figures were offered by American Safety, Stollings did not address their accuracy in its response.  Thus, the court assumes they are correct.  Stollings income for 2005 and 2006 has not been furnished to the court.

be $270,000 and is comparable to the 2004 figure of $208,000. These figures underscore the purely speculative and conjectural nature of the $20 to $28 million demand.  Summary judgment in favor of American Safety is plainly appropriate on the issue of lost profits.

IV.

Accordingly, it is ORDERED as follows:

1.   Stollings' motion for partial summary judgment as to the general business practice be, and it hereby is, denied;

2.   American Safety's motion for summary judgment on Count IV of the counterclaim be, and it hereby is, denied; and

3.   American Safety's motion for partial summary judgment on the alleged lost business opportunities of Stollings be, and it hereby is, granted.

31

          The Clerk is directed to forward copies of this

memorandum opinion and order to all counsel of record.


                         DATED: July 30, 2007


                         _____
                         John T. Copenhaver, Jr.
                         United States District Judge